**SHER TREMONTE** LLP

August 9, 2021

**VIA ECF**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Gonzalez, et al.*, 18 Cr. 601 (PGG)

Dear Judge Gardephe:

      We write on behalf of our client, Jean-Claude Okongo Landji, a defendant in the above-referenced matter, to respectfully renew our request for a *Kastigar* hearing concerning the government's handling of privileged material seized from Mr. Landj and his co-defendant Jibril Adamu.  In its April 29, 2021 Order, the Court denied the defendants' request for a hearing in light of declarations submitted by the government and DEA personnel (the "Declarations"), and denied defendants' request that the materials in the possession of the government be returned based on the government's representation that all responsive had been returned.  Dkt. # 460, at 14-16 & n.4.  We do not ask the Court to reconsider its decision lightly.  However, a review of the original physical evidence at the U.S. Attorney's Office has revealed new facts relevant to this issue, including:  (1) The government has in its possession an evidence bag containing legal papers that it never copied or produced to Mr. Landji; (2) Mr. Landji's property, which was seized by the DEA upon his extradition to the U.S., contains privileged material, including a memo from his Croatian lawyer discussing defense strategy; (3) it appears likely that, at a minimum, DEA agents tasked with investigating this matter viewed and were tainted by the privileged material; and (4) several of the government's previous representations on this topic, on which the Court relied, are untrue.  Accordingly, we respectfully renew our request for a hearing, and we request additional discovery.  Due to the near-approaching trial date, we respectfully request that the Court order disclosure of the requested discovery and schedule a hearing as soon as practicable.

    **I.**    **DEA Agents Obtain Mr. Landji's Privileged Legal Documents**

      Messrs. Landji and Adamu were arrested in Zagreb, Croatia on October 30, 2018.  They were then held in Croatian detention for nearly a year before ultimately being extradited to the United States.  *See* Decl. of Jean-Claude Okongo Landji ¶ 3, attached hereto as **Exhibit A**.  While in Croatian detention, Mr. Landji was represented by

Hon. Paul G. Gardephe
August 9, 2021
Page 2

Krešimir Šušnjar, a Croatian attorney who speaks English. *Id.* ¶ 4.[1] Over the course of his representation of Mr. Landji, Mr. Šušnjar consulted with him, maintained correspondence with Mr. Landji's family, and filed several motions concerning Mr. Landji's extradition, prolonged detention, and the search of Mr. Landji's aircraft by Croatian law enforcement officials. *Id.* Because Mr. Landji does not speak Croatian, Mr. Šušnjar arranged for certified translations of Croatian legal documents in both French and English to be provided to him. *Id.* ¶ 5. Mr. Landji took notes on both the Croatian and U.S. legal documents he received to memorialize his thoughts in preparation for consultation with his attorney. *Id.* ¶ 6. Finally, Mr. Šušnjar prepared a memo, which detailed the proof, as he saw it, against Mr. Landji, the areas where, in his opinion, there was an absence of proof, and his legal conclusion as to both the lawfulness of the search of the aircraft and the government's ability to maintain the charges. *Id.* ¶ 7.[2] In sum, this memo (the "Šušnjar Memo") outlined Mr. Landji's defense strategy.

On October 17, 2019, Mr. Landji was extradited to the United States along with Mr. Adamu. *Id.* ¶ 8. At the time, Mr. Landji had three receptacles of personal property in his possession: Two suitcases of personal effects and a blue cloth bag, marked "Shangzhiwei Gentleman," which contained all of his legal documents. *Id.* Some of the legal documents were contained in folders within the bag and some were loose papers. *Id.* The Šušnjar Memo was on the top of the stack of folders and documents, as it was, in Mr. Landji's view, the document most critical to his defense. *Id.* When Mr. Landji arrived at the airport to be extradited, he had his personal effects in his suitcases and the blue cloth bag with his legal documents tucked under his arm. *Id.* ¶ 9. He was met by U.S. Consular Officials, a U.S. Marshal, and two DEA agents. *Id.* One of the DEA agents searched through Mr. Landji's luggage and took the Shangzhiwei Gentleman bag from him. *Id.* Mr. Landji identified the bag as containing his legal documents, and the agent responded that it was evidence. *Id.* Mr. Landji did not see his legal documents or luggage again after that.

## II.   Mr. Landji Seeks the Return of His Documents

Following his extradition, Mr. Landji's U.S. counsel advised the government that the documents seized from Mr. Landji included privileged material and requested their return. Counsel subsequently included in Mr. Landji's pretrial motions a request that the Court order return of the materials and to disclose which, if any, government lawyers or agents reviewed them. Dkt. # 352, at 8. Counsel argued that, to the extent any such material was reviewed, a hearing was warranted pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972). *Id.*

---

[1]   Mr. Adamu had separate counsel. *Id.* ¶ 3.
[2]   Simultaneous with this filing, we are separately submitting the Šušnjar Memo to the Court *ex parte* for *in camera* review.

Hon. Paul G. Gardephe
August 9, 2021
Page 3

      A.  <u>The Government Produces Certain Documents to Mr. Landji in Discovery</u>

In response to the defense's request (and prior to the filing of pretrial motions), the government produced documents, Bates-stamped JCOL (the "JCOL Production") to Mr. Landji and indicated that these documents were copies of his personal papers that the government had in its possession. The JCOL Production contained, among other things, a copy of the U.S. indictment with various notations by Mr. Landji on the document, emails between Mr. Šušnjar and Mr. Landji's wife, and other documents that Mr. Landji had obtained through Mr. Šušnjar that were relevant to his defense. Decl. of Noam Biale ¶ 4, attached hereto as **Exhibit B**. The JCOL production also contained certain personal documents, such as family photos and letters from Mr. Landji's children. *Id.* Finally, as relevant here, the JCOL production contained this photograph of several items of Mr. Landji's property next to a DEA evidence bag numbered EM000159217:



Hon. Paul G. Gardephe
August 9, 2021
Page 4

As can be seen in the photograph, next to the evidence bag is the Shangzhiwei Gentleman cloth bag, which appears to contain a stack of documents. The JCOL Production did *not* contain certain documents that Mr. Landji had had in his possession in Croatia, including, most notably, the Šušnjar Memo.

   B. <u>The Government Represents That All Documents Were Returned and That It Had Not Reviewed Any Documents</u>

In response to Mr. Landji's pretrial motions, the government filed an opposing Memorandum of Law. Dkt. # 364. Therein, the government argued that defendants' request for return of the documents was moot because, it stated, "[t]he Government has provided all of the materials in its possession that are responsive to the Defendants' request." *Id.* at 17. The government explained that, upon the defendants' extradition, Croatian authorities provided two packets of documents to the DEA, that after U.S. counsel alerted the government to the existence of potentially privileged material in its possession, the government "identified the two packets of documents that had been taken from Landji and Adamu during the extradition process[,] . . . obtained copies of these documents from the DEA and, on or about January 21, 2020, produced to each of the Defendants their respective packet of documents." *Id.* at 18. The government further represented that it was unaware of any other documents responsive to the defendants' request. *Id.* The government also represented that it had not reviewed any of the materials and stated that it had confirmed that none of the DEA agents had reviewed them either. *Id.* at 19. Finally, the government argued that the defendants should identify specific items or categories of items that it believed were protected by privilege and "[i]f the Government decides to conduct any further review of these materials, it . . . will designate a filter or wall team" to conduct such review. *Id.*

In support of its Memorandum of Law, the government attached the Declarations of AUSA Matthew Hellman, Dkt. # 398 ("Hellman Decl."); DEA Supervisory Special Agent Matthew Fihlman, Dkt # 398-1 ("Fihlman Decl."); and DEA Special Agent Douglas Waters, Dkt. # 398-2 ("Waters Decl."). The Declarations stated in sum and substance:

- AUSA Hellman spoke with numerous members of the DEA involved in the investigation of this case, and determined that the following DEA personnel handled the documents: SSA Fihlman, SA Waters, Special Agent Joseph Catalano, and Analyst Jeffrey Lloyd. Hellman Decl. ¶ 4.
- "Based on [his] conversations with those DEA personnel," AUSA Hellman learned that "at least many of the Documents appear to be in Croatian; none of the DEA Personnel can read the Croatian language, and the DEA Personnel did not review the contents of the documents, apart from the limited viewing described in the Declarations of Special Agents Fihlman and Waters." *Id.*
- AUSA Hellman and SA Waters "assembled copies of the Documents" and produced those documents to the defendants. *Id.* ¶ 5.

- AUSA Hellman averred that he had not reviewed the documents nor had any of the past or present AUSAs on the matter. *Id.* ¶ 6.
- Both SSA Fihlman and SA Waters declared that the documents in the defendants' personal property "appeared on their face to be related to their Croatian proceedings and responsive to their requests (*e.g.*, documents that bear Croatian writing and judicial marking or appeared to contain handwritten notes in Croatian)," and that they "cannot read the Croatian language." Fihlman Decl. ¶ 5; *see also* Waters Decl. ¶ 4 (stating same, verbatim).
- SSA Fihlman declared that he assisted in the extradition of the defendants along with SA Catalano. Fihlman Decl. ¶ 3.
- SSA Fihlman received the defendants' "paperwork and personal effects" from Croatian authorities, and then, based on a request purportedly from the defendants "to separate their paperwork from their effects," SSA Fihlman went through the property and "gathered and packaged the paperwork in two packets, with one packet containing the paperwork from defendant Adamu and the other packet containing the paperwork for defendant Landji." *Id.* ¶ 5.
- SSA Fihlman and SA Catalano maintained custody of the documents and then SA Catalano alone transferred them to SA Waters upon their arrival in the United States. *Id.* ¶ 6.
- SA Waters declared that he received two packets from SA Catalano, "each containing approximately several hundred pages of documents." Waters Decl. ¶ 3.
- SA Waters scanned the documents with the assistance of DEA Intelligence Analyst Jeffrey Lloyd and copied them to a hard drive. *Id.* ¶ 4. SA Waters and Analyst Lloyd then transferred copies of the documents to the U.S. Attorney's Office. *Id.*
- SSA Fihlman averred that based on his "conversations with Special Agent Catalano," he is aware that SA Catalano did not review the contents of the documents. Fihlman Decl. ¶ 7. Similarly SA Waters averred that based on his "conversations with Analyst Lloyd," he is aware that Analyst Lloyd did not review the contents of the documents. Waters Decl. ¶ 5. Neither SA Catalano nor Analyst Lloyd submitted a declaration.[3]

C. The Court Relies on the Government's Representations to Deny the Defendants' Pretrial Motions

On April 29, 2021, the Court issued a decision denying the defendants' pretrial motions, including its motion for return of documents and for a hearing. Dkt. # 460. The Court relied on numerous of the assertions made by the government in its Memorandum of Law and in the Declarations. In particular, the Court credited the DEA agents'

---

[3] Further, the Hellman Declaration indicates that while AUSA Hellman spoke with numerous DEA personnel, he did not speak with SA Catalano, an agent who apparently had sole custody of the documents for at least some period of time. *See* Fihlman Decl. ¶ 6.

Hon. Paul G. Gardephe
August 9, 2021
Page 6

assertion that they separated documents "potentially related to Defendants' Croatian court proceedings" from "other paperwork" at the defendants' request. *Id.* at 14. The Court stated, "The agents did not review these documents, which are in Croatian, a language that the agents do not understand and cannot read." *Id.* The Court further credited that the government had produced "copies of the alleged privileged material" and that "no Government personnel have reviewed the contents of these allegedly privileged documents." *Id.* The Court held that, in light of the Declarations, no hearing was warranted, and that the defendants had not established that the documents were subject to the attorney-client privilege. *Id.* at 14-15 & n.4. Accordingly, the Court denied defendants' request for return of the materials. *Id.* at 15.

### III. Counsel's Review of Mr. Landji's Personal Property Reveals Privileged Documents and Inconsistencies in the Government's Representations

On July 28, 2021, undersigned counsel reviewed the original property seized by the DEA at the U.S. Attorney's Office. Counsel found privileged documents among the materials, which had not previously been produced, *including the Šušnjar Memo*. Counsel's review, and subsequent discussion with Mr. Landji, also revealed numerous inconsistencies between the representations made by the government and the actual state of the evidence.

*First,* contrary to SSA Fihlman's description of two packets of paperwork, one for each defendant, the DEA in fact produced *three* bags of property: One bag marked "Landji" and numbered EL000064068 ("Bag 64068"), one marked "Adamu," and one with no name numbered EM000159217 ("Bag 159217"). Biale Decl. ¶ 7. The undersigned declined to review the bag marked "Adamu," since it presumably contained privileged material belonging to Mr. Adamu. *Id.* The government represented, however, that the two remaining bags constituted the material belonging to Mr. Landji. *Id.*

*Second*, Bag 159217 matched approximately to the JCOL production and contained only a stack of papers. *Id.* ¶ 8. Bag 64068, however, contained both personal effects, such as business cards, a Bible, and various items related to aviation, as well as numerous legal documents. *Id.* ¶ 9. These legal documents were mostly, though not exclusively, contained in three blue folders and one white folder. *Id.* The blue folders contained various Croatian court documents, such as the judicial decisions on the defendants' continued detention, a decision authorizing the investigation of the aircraft, and the extradition decision. *Id.* These decisions were in Croatian; however, contrary to the Declarations, most, if not all, of these documents had certified translations in either English or French attached *on top* of the Croatian-language decision. *Id.* In addition, numerous of these legal documents contained handwritten notes by Mr. Landji, memorializing issues he planned to discuss with his lawyer and on which he wanted his lawyer's counsel. *Id.*; *see also* Landji Decl. ¶ 6. The majority of these notes were in English, with some additional notes in French. Biale Decl. ¶ 9.

*Third*, the white folder contained the Šušnjar Memo, outlining Mr. Landji's defense strategy. *Id.* ¶ 11. That Memo, according to Mr. Landji, was not contained in any folder when it was in his possession, but rather was at the top of his stack of documents in the Shangzhiwei Gentleman cloth bag. Landji Decl. ¶ 8. The Shangzhiwei Gentleman bag was found empty and folded up inside Bag 64068. Biale Decl. ¶ 12.

*Fourth*, Bag 64068 contained documents that pertained only to Mr. Adamu, including his signed advice of rights form and notes on the charges that appeared to be work product prepared for discussion with a lawyer, which Mr. Landji identified as written in Mr. Adamu's handwriting. Biale Decl. ¶ 14; Landji Decl. ¶ 15.

*Finally*, when counsel provided a description to Mr. Landji of what was contained in Bag 64068, Mr. Landji stated that the bag contained both personal items from his suitcases and legal documents that were in the Shangzhiwei Gentleman bag. Landji Decl. ¶ 14. Contrary to the Fihlman Declaration, Mr. Landji did not ask him to separate these items – he already maintained them separately – and, in fact, they were *not* separated, rather they were combined. *See id.* ¶ 9. Further, the legal documents that were maintained together were inexplicably divided between Bag 64068 and Bag 159217, without any coherent distinction. *See id.* ¶ 14; Biale Decl. ¶ 10.

### IV. The Government Refuses to Explain Inconsistencies in the Declarations or Why the Additional Legal Documents Were Not Disclosed

Following counsel's review of the physical evidence, the undersigned sent the assigned AUSAs questions about what was discovered and attempted to resolve the inconsistencies that appeared from the government's prior representations concerning the documents. For example, defense counsel asked why only one packet of material out of the two that existed had been previously produced to Mr. Landji; why the AUSAs relied on the DEA agents' statement that the responsive documents were all in Croatian when it was apparent from a cursory glance at the documents that this statement was false; and why, in response to the Court's November 20, 2020 Order directed the government to obtain declarations addressing this issue, the government failed even to speak with – let alone obtain a declaration from – SA Catalano, who had sole custody of the documents for at least some period of time.

By email dated August 4, 2021, attached hereto as **Exhibit C**, the government largely declined to respond to any of defense counsel's inquiries.[4] The government re-asserted, in conclusory fashion, that no one in the DEA or USAO had reviewed any of the potentially privileged material. Ex. C, at 1. It stated that its process in obtaining the

---

[4] The government also indicated to defense counsel by phone that it wished to produce the material in Bag 64068, which had not been previously disclosed to the defense. Biale Decl. ¶ 16. The government asked whether the defense consented to a taint paralegal removing the Bag's contents to scan, Bates-stamp, and produce them. Defense counsel consented to this procedure. *Id.*; *see also* Ex. C, at 2.

Hon. Paul G. Gardephe
August 9, 2021
Page 8

Declarations was irrelevant. *Id.* And it stated that none of the questions from defense counsel bore on whether the documents were reviewed. *Id.*

The government provided two statements of clarification, however:

*First*, although the Hellman Declaration stated that AUSA Hellman and SA Waters had "assembled copies of the Documents," Hellman Decl. ¶ 5, AUSA Hellman clarified in his email that he "did not personally copy or otherwise handle (or ever view) any of the materials contained in the evidence bags in question." Ex. C, at 1. Instead, he stated that his role was limited to directing a paralegal to Bates-stamp copies of the documents provided by the DEA and to produce those to the defendants. *Id.*

*Second*, the government explained the distribution of legal documents between the two evidence bags as follows:

> Our understanding is that DEA agents made efforts to scan the materials they could, after determining what materials appeared to be related to the case (weeding out newspapers or other similar documents) without actually reviewing them, and that the items were placed back into bags without any particular effort to leave them as they were initially found. Beyond that, the documents were in the bags essentially as the Croatian authorities had first provided them to the DEA.

*Id.*

## V. A Hearing Is Warranted

### A. Legal Standard

In *Kastigar*, the Supreme Court upheld the strong protection of derivative use immunity for compelled testimony and set forth a mechanism to protect it; namely, "[w]hen a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'" *United States v. Allen*, 864 F.3d 63, 91 (2d Cir. 2017) (quoting *Kastigar*, 406 U.S. at 461-62). This "heavy burden" has been applied to invasions of the attorney-client privilege. *United States v. Weissman*, No. S2 94 CR. 760 (CSH), 1996 WL 751386, at *10 (S.D.N.Y. Dec. 26, 1996); *accord United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991). While government intrusion on the attorney-client privilege does not result in automatic dismissal of the indictment unless "the conduct of the Government has been manifestly and avowedly corrupt," *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975), where "hearing evidence demonstrate[s] that [a] preview of defense strategy was derived from" the materials the government has observed, the defendant may establish prejudice mandating a dismissal of the indictment. *Schwimmer*, 924 F.2d at 447.

Hon. Paul G. Gardephe
August 9, 2021
Page 9

At such a hearing, the government's burden "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source *wholly independent* of the [privileged material]." *Kastigar*, 406 U.S. at 460 (emphasis added). "Neither a mere 'assertion that the [privileged material] was not used" nor even proof that the prosecutor "had no direct or indirect access to the [privileged material]' is sufficient." *United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995) (quoting *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977)). The Second Circuit has recently held in the context of immunized testimony that where a witness "has materially altered his testimony after being substantially exposed to a defendant's compelled testimony" and the government offers "a bare, generalized denial of taint," such denial is "insufficient as a matter of law to sustain the prosecution's burden of proof" and the indictment must be dismissed. *Allen*, 864 F.3d at 97. So too, by extension, where a member of the prosecution team has been exposed to privileged material and the theory of prosecution has shifted to respond to any defense derived from such material, the government must prove "a wholly independent source" for any material alteration in the government's theory and may not rely on "bare, generalized denial[s] of taint." *Id.*

B. The Government's Previous Representations Are Untrue

The Court previously relied on the Declarations and government's Memorandum of Law in holding that a hearing was not warranted, but subsequent developments have made clear that numerous statements in the Declarations are, at a minimum, inaccurate and, on certain key points, apparently false. The inconsistencies in the government's previous representations include:

- The government represented in its Memorandum of Law that all documents responsive to the defendants' request had been returned. Contrary to that averment, an entire evidence bag's worth of documents was not and still has not been produced approximately two months in advance of trial.
- Both DEA agents stated – and the AUSA repeated – that the responsive documents were in the Croatian language and since they cannot read Croatian, they did not review them. That is false. Even a cursory glance at the documents makes it clear that (a) the vast majority of the Croatian legal documents had certified translations appended to *the top* of them, in both English and French; (b) the correspondence and legal memo of Mr. Landji's attorney were in English; and (c) Mr. Landji's notes were primarily in English, with some in French.
- SSA Fihlman stated in his declaration that he received the paperwork and personal effects of the defendants from Croatian authorities. In contrast, Mr. Landji averred that he kept all of his legal paperwork in the blue Shangzhiewi Gentleman bag tucked under his arm, and that the agents (presumably Fihlman and Catalano) took the documents directly from him.
- SSA Fihlman stated that the defendants asked him to separate their personal effects from their legal documents. In contrast, Mr. Landji averred – and the

- photo above corroborates – that he himself separated his legal documents for transport in the Shangzhiewi Gentleman bag. Further, counsel's review of Bag 64068 shows that legal documents and personal effects *were not* separated, but instead were mixed together.
- The agents further represented, as communicated by the government in its email, Ex. C, that they scanned the documents "after determining what material appeared to be related to the case (weeding out newspapers or other similar documents) without actually reviewing them," *id.* at 1. That statement, to the extent it is coherent, is belied by the haphazard distribution of materials, which includes both materials that are obviously related to the case in Bag 64068 (such as certified translations of Croatian court documents), and materials that are obviously of a personal nature in Bag 159217 (such as photographs of Mr. Landji's family).

A hearing is thus warranted to resolve the contradictions between the Declarations and the government's other prior representations with the actual state of the physical evidence and the declaration provided by Mr. Landji. *See United States v. Cardenas*, 302 F. App'x 14, 16-17 (2d Cir. 2008).

### C. The Evidence Indicates a Strong Likelihood That, At a Minimum, the DEA Agents Were Tainted

Counsel's discovery of Bag 64068 and the placement of the contents therein creates an inference that, contrary to the agents' prior statements, they did indeed view material protected by the attorney-client privilege. First, it is clear that the agents removed Mr. Landji's legal papers from the Shangzhiewi Gentleman bag. As Mr. Landji averred, the Šušnjar Memo was on the top of the stack of documents in that bag. Agents then apparently placed that memo – which is unmistakably related to the case, as it has the attorney's letterhead on the top – into a folder that they then mixed in with Mr. Landji's personal items. They did the same with other documents, such as the certified translations of the Croatian court proceedings and documents with Mr. Landji's notes that he made in preparation for meeting with his attorney. In addition, they split up the stack of legal documents that was contained in the Shangzhiewi Gentleman bag and placed some in Bag 64068 and others in Bag 159217.

At least four agents on the investigative team appear to have been involved in reviewing the documents: SSA Fihlman, SA Catalano, SA Waters, and Analyst Lloyd. We do not know precisely who removed the Šušnjar Memo from the bag and transferred it to the white folder – after apparently determining not to include it among the documents that would later be provided to defense counsel – but one of these agents did. Further, SA Catalano apparently had sole possession of the materials for some period, and yet the government appears not to have even *spoken* with him, let alone obtained his sworn declaration. *See* Fihlman Decl. ¶ 6; Hellman Decl. ¶ 4. Analyst Lloyd reportedly "scanned," "copied," and likely "observed" the documents, as SA Waters stated he did, Waters Decl. ¶ 4, yet Analyst Lloyd also provided no sworn statement. At a minimum,

Hon. Paul G. Gardephe
August 9, 2021
Page 11

the Declarations presently before the Court do not establish that the agents did not view the privileged documents that we now know are contained among the materials they "observed." *Id.*

Rather than attempt to provide an explanation of their prior representations in light of the new facts discovered by counsel, the government has continued to rely on the DEA agents' assertions that are sharply at odds with the physical evidence and has persisted in asserting bare, conclusory denials of taint. That is insufficient to meet its burden under *Kastigar*. *See Nanni*, 59 F.3d at 1432 (noting that government may not meet its burden with a "mere assertion that the immunized testimony was not used") (internal quotation marks omitted); *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir. 1982) ("[T]he heavy burden cast upon the Government to prove independent sources of the evidence it intends to introduce when it prosecutes a witness who has testified under use immunity is not satisfied by the prosecution's assertion that immunized testimony was not used. Such disclaimer provides an inadequate basis for the denial of a motion to dismiss an indictment."). Where, as here, the defendant has come forward with evidence that raises an inference that members of the prosecution team were exposed to privileged material, the Court should hold a hearing at which the government has the burden of proof to demonstrate a source wholly independent from the privileged material.

> D. The Government's Theory of Prosecution Has Shifted in a Manner Suggesting Taint

While courts have discretion to decide when to hold a *Kastigar* hearing – before, during, or after trial – in *Allen*, the Second Circuit cast doubt on Judge Rakoff's holding that deferring such hearing to after trial is the "prevailing practice" in this Circuit, declining to opine on "the merits of such a practice or whether such a practice prevails." *Allen*, 864 F.3d at 78 n.58. Nonetheless, here it is unnecessary to defer such a hearing because it is apparent already that the government's theory has shifted in response to the prosecution team viewing the Šušnjar Memo and defendants' notes reflecting their defense strategy. Because the following discussion details both the contents of the privileged materials at issue and defense strategy, we provide this information to the Court *ex parte* for *in camera* review:

[text redacted]

Hon. Paul G. Gardephe
August 9, 2021
Page 12



E. Additional Questions That Should Be Explored at a Hearing

There are several potentially relevant issues that remain unexplained by the current record and should be further explored at a hearing.

Most notably, what did SA Catalano do with the defendants' material when he had it in his sole possession and transferred it to SA Waters? As noted above, it does not appear that the government even spoke with SA Catalano (they have, at least, declined to answer our question whether his omission from the Hellman Declaration was an oversight or not), let alone obtained a sworn declaration from him. Accordingly, SA Catalano should be compelled to give testimony at the hearing, along with the agents who

Hon. Paul G. Gardephe
August 9, 2021
Page 13

submitted declarations and Analyst Lloyd, who handled the materials and was with SA Waters when he "observed" the documents, but did not submit a declaration.

In addition, AUSA Hellman has clarified that, although he stated in his declaration that he "assembled and copied" the material, in fact he merely directed a paralegal at the U.S. Attorney's Office to Bates-stamp and produce the documents. *Compare* Hellman Decl. ¶ 5 *with* Ex. C, at 1. We take AUSA Hellman at his word and do not suggest that he has been less than forthcoming with the Court. Questions remain, however (which the government has declined to answer), as to why the lead AUSA was involved at all in handling the material, rather than a taint AUSA or paralegal. As noted above, the parties have discussed a procedure to produce the materials in Bag 64068, which have not been previously produced to the defense, whereby a taint paralegal will scan the materials, Bates-stamp them, and provide them to counsel. Mr. Landji has readily consented to this procedure, which is designed to protect the privilege. It is unclear why, when Mr. Landji advised the government of the potentially privileged material, it did not employ this procedure from the outset.

## VI.    Request for Discovery

Finally, while we have endeavored to identify areas where the government's theory of prosecution has shifted from when it charged the case to after members of the prosecution team viewed the privileged material, our ability to do so is limited without knowing what the government presented to the Grand Jury and what it plans to present at trial. Accordingly, we respectfully request that the Court order disclosure of the Grand Jury minutes. *See United States v. Moten*, 582 F.2d 654, 664 (2d Cir. 1978) (defendant's showing of specific need for Grand Jury minutes is sufficient to "override the generalized need for grand jury secrecy and to shift the burden to the government to specify which portions of the grand jury minutes, if any, must remain secret in order to protect a legitimate interest of the government"). In addition, the government has not indicated when it plans to disclose its 3500 material and exhibit list. In order to assess the extent to which the government's case has changed for the reasons set forth above, we respectfully request that the Court direct early production of both of these categories of material.

Respectfully submitted,

/s/
Michael Tremonte
Noam Biale

cc:    All counsel (via ECF)
       Jean-Claude Okongo Landji (by U.S. Mail)